UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JEFFREY WOODARD, #159374,

        Plaintiff,

v.

UNKNOWN HOOVER,

        Defendant.
_____/

Case No. 2:22-cv-28

Hon. Hala Y. Jarbou
Chief U.S. District Judge

## REPORT AND RECOMMENDATION

### I.  Introduction

This Report and Recommendation (R&R) addresses Defendant Sergeant (Sgt.) Hoover's motion for summary judgment.  (ECF No. 21.)

Plaintiff—state prisoner Jeffrey Woodard—filed suit pursuant to 28 U.S.C. § 1983 on February 7, 2022.  In his verified complaint, Woodard alleged that while he was incarcerated at the Baraga Correctional Facility (AMF) in Baraga, Michigan, Defendant Sgt. Hoover utilized excessive force against him in violation of Woodard's Eighth Amendment rights.  More specifically, Woodard alleged that when he refused Sgt. Hoover's orders to bend and spread during a strip search on July 13, 2021, Hoover unnecessarily deployed chemical agents against him.  Woodard further alleged that he was not given the opportunity to decontaminate after Hoover deployed the chemical agents, and that he was left with chemical burns across his body.

Woodard sues Sgt. Hoover in his individual and official capacities for monetary and injunctive relief.

Sgt. Hoover now moves for summary judgment, asserting that video-footage of the July 13, 2021 incident establishes that Sgt. Hoover deployed the chemical agent in a good-faith effort to maintain and restore discipline. Per that video-footage, Sgt. Hoover only deployed the chemical agent after Woodard's repeated refusal to comply with a strip search. And Woodard had running water and towels at his disposal to wash the chemical agent from his body after complying with the strip-search. As such, Sgt. Hoover avers that there are no genuine issues of material fact and that he is entitled to summary judgment.

The undersigned respectfully recommends that the Court grant Sgt. Hoover's motion for summary judgment. By Woodard's own admissions in his verified complaint, which are confirmed by the video-footage of the incident, Sgt. Hoover only deployed the chemical agent after Woodard repeatedly refused to comply with a strip search. In the undersigned's opinion, no reasonable finder of fact could determine that the chemical agent was used maliciously and sadistically to cause harm. Furthermore, Woodard has not provided evidence that Sgt. Hoover was deliberately indifferent to his medical needs related to the chemical agent. As soon as Woodard complied with the strip search, he was taken out to the yard to air out the agent and to meet with a facility nurse. Sgt. Hoover then specifically advised Woodard that he could rinse off in his cell, and that he should use a washcloth around his eyes.

Accordingly, in the undersigned's opinion, Sgt. Hoover has met the summary judgment burden set forth in Federal Rule of Civil Procedure 56.

## II.   Woodard's Factual Allegations

Woodard says that on July 13, 2021, Sgt. Hoover claimed that Woodard's cell smelled of fermentation. (ECF No. 1, PageID.2.) Hoover therefore ordered officers to search Woodard's cell, and to conduct a strip search of Woodard.

According to Woodard, he initially complied with Sgt. Hoover's orders, backing up to the slot in his cell door and allowing AMF officers to place him in handcuffs. (*Id.*) Officers then escorted Woodard to a shower cage. (*Id.*, PageID.3.) Once Woodard was locked in the shower cage, Sgt. Hoover allegedly told Woodard to strip. After Woodard complied, Hoover ordered Woodard to bend and spread, so that the officers could view his anus. (*Id.*)

Woodard did not want to comply with the bend and spread order. Instead, he suggested that he would squat and cough, which Woodard believed to be sufficient. (*Id.*) But Sgt. Hoover disagreed, assembling an Emergency Response Team (ERT) and arranging for the use of chemical agents to force Woodard to comply with the order.

Woodard says that he was held in the shower cage for approximately thirty minutes before Sgt. Hoover approached again. (*Id.*, PageID.4.) Hoover again ordered Woodard to bend and spread. Woodard refused. This time, Sgt. Hoover deployed chemical agents, hitting Woodard in the face, chest, and stomach until he complied with the bend and spread order. (*Id.*)

According to Woodard, he was not given the opportunity to decontaminate after he complied with Sgt. Hoover's order. Instead, he was placed in a restraint chair, and was taken outside to the segregation yard for approximately one hour. (*Id.*) During that time, a facility nurse attempted to inspect Woodard, but Woodard told her not to touch him. Woodard says that once he was back in his cell, he attempted to wash the chemical agent off of him with water, but that the water made his chemical burns worse. (*Id.*) Woodard was not permitted to shower, or provided new bed linens, for three days. (*Id.*, PageID.5.) Woodard claims that his chemical burns lasted more than two months. (*Id.*, PageID.5-6.)

Woodard contends that he was not being violent or threatening during the July 13, 2021 incident. (*Id.*, PageID.5.) As such, he avers that the use of chemical agents constituted excessive force. (*Id.*, PageID.7.)

### III. July 13, 2021, Videorecording

In moving for summary judgment, Sgt. Hoover provided the court with a videorecording of the July 13, 2021, incident. (ECF No. 23.)

The videorecording begins with the ERT gathering in front of the shower cage in which Woodard is locked. (*Id.* at 00:00.) Woodard is seen leaning against the door of the shower cage.

Sgt. Hoover begins explaining to Woodard that he has been given a direct order to comply with a strip search, and that if he does not comply with the order, Sgt. Hoover has been authorized to deploy a chemical agent. (*Id.* at 00:13-00:27.) Meanwhile, Woodard yells various expletives at Sgt. Hoover.

4

Sgt. Hoover then informs Woodard that he has one final chance to comply with Sgt. Hoover's direct order. (*Id.* at 00:30-00:33.) Woodard continues to lean against the shower cage, yelling at Sgt. Hoover, and calling him various slurs. Sgt. Hoover puts on a gas mask, and begins approaching the shower cage, stating: "Last chance for you to comply with a strip search." (*Id.* at 00:47-00:50.) When he is in front of the cage, Sgt. Hoover repeatedly states: "Come on, I don't have to do this." (*Id.* at 00:51-00:56.)

Despite Sgt. Hoover's warnings, Woodard continues to yell. And when Sgt. Hoover leans forward to put the chemical agent into the slot in front of the shower cage, Woodard continues to stand directly in front of him. (*Id.* at 00:58.) Sgt. Hoover then deploys the chemical agent for approximately four seconds. (*Id.* at 00:58-01:02.) At this point, Woodard turns around, coughing, and appears to step under the shower head. (*Id.* at 01:03.) Woodard places his hand on the shower handle, though it is unclear from the video whether Woodard turns the shower on. (*Id.*) Moments later, Woodard complies with the strip search order, though he continues to complain about Sgt. Hoover ordering him to bend and spread. (*Id.* at 01:23-02:50.)

After Woodard complies with the order, Sgt. Hoover hands Woodard a new pair of shorts. (*Id.* at 02:48-02:50.) Sgt. Hoover tells Woodard to stand up so that the officers can get him out of the shower cage and take him outside. (*Id.*) While continuing to yell, Woodard pulls on the shorts, and allows the ERT to shackle his feet and hands through the slots in shower cage door. (*Id.* at 02:52-05:00.) He is then placed in a restraint chair and taken up the stairs and outside into the yard. (*Id.* at

5

05:05-7:40.) Once in the yard, the ERT searches through Woodard's braids for contraband. (*Id.* at 7:47-08:23.)

As the ERT finishes searching through Woodard's braids, a nurse approaches. (*Id.* at 08:29.) She asks to take Woodard's vitals, to which he responds: "Fuck no." (*Id.* at 08:31-08:33.) Woodard then tells the nurse not to touch him, and she leaves. (*Id.* at 08:36-08:38.) Sgt. Hoover then instructs the ERT to keep Woodard outside for a few minutes to "let him get some oxygen" because he is "high risk." (*Id.* at 08:45-08:50.) Woodard responds: "You're going to let me fry in the sun, huh? You know this shit is burning." (*Id.* at 08:51-08:54.) The ERT immediately wheels Woodard back into the facility, while Woodard complains that he did nothing to warrant the use of a chemical agent, which he says is continuing to burn. (*Id.* at 09:04-09:16.)

After approximately five minutes, Sgt. Hoover approaches Woodard. (*Id.* at 14:23.) He tells Woodard that the ERT is going to take him back to his cell, and that once in his cell, Woodard can wash off. (*Id.* at 14:24-14:29.) Hoover tells Woodard to make sure he uses a washcloth around his eyes. (*Id.* at 14:30-14:33.) Woodard responds by telling Hoover not to speak to him. (*Id.* at 14:33-14:36.) Once the ERT and Woodard arrive at Woodard's cell, the ERT puts Woodard back in the cell, and removes his shackles through the cell slots. (*Id.* at 16:48-18:19.)

The total time that elapses from the ERT's arrival at the shower cage to the ERT placing Woodard back into his cell is eighteen minutes and twenty-one seconds.

### IV. Summary Judgment Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Kocak v. Comty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### V. Analysis

As an initial matter, the undersigned notes that Woodard's factual allegations are almost entirely consistent with the events depicted in the video.[1] Moreover, Woodard's allegations are consistent with Sgt. Hoover's affidavit, though Sgt. Hoover's affidavit gives more context to the situation. Sgt. Hoover says that he ordered that Woodard be strip searched on July 13, 2021, after he observed a cough drop bag with an unknown liquid on the exterior windowsill of Woodard's cell. (ECF

---

[1] The primary exception being that Woodard alleges he was left outside for approximately one hour, but the video shows that he was outside with the ERT for approximately one minute and thirty seconds.

7

No.22-2, PageID.85-86.) Hoover explains that cough drop bags are commonly used to make alcohol in the prisons, which is illegal. (*Id.*, PageID.86.) Sgt. Hoover further explains that a search of Woodard's cell revealed eighteen slices of bread and twenty-eight sugar packets; more items associated with fermenting alcohol in prison. Hoover therefore ordered the strip search, to ensure that Woodard was not concealing contraband on his person. (*Id.*) In addition, Hoover attests that as soon as he administered the chemical agent, Woodard turned on the shower in the shower cage and rinsed his face. (*Id.*, PageID.87.)

Woodard claims that Sgt. Hoover violated his Eighth Amendment rights in two ways. First, he says that Sgt. Hoover utilized excessive force against him by deploying the chemical agent on July 13, 2021. (ECF No. 1, PageID.7.) Second, he says that Sgt. Hoover acted with deliberate indifference to his serious medical needs when Sgt. Hoover failed to decontaminate Woodard's body, clothing, or bed linens for three days following Sgt. Hoover's use of the chemical agent.[2] (ECF No. 1, PageID.8.)

The Eighth Amendment embodies a constitutional limitation on the power of the states to punish those convicted of a crime. Punishment may not be "barbarous", nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*,

---

[2]    Woodard's complaint does not explicitly aver that Sgt. Hoover acted with deliberate indifference to his serious medical needs. But Woodard does ask the Court to "[d]eclare that defendant violated Plaintiff's 8th AM [sic] rights when failing to decontaminate Plaintiff's body, clothing, and cell linen, forcing Plaintiff to live the effects of the chemical agent." (ECF No. 1, PageID.8.)  Because Woodard is proceeding pro se, this Court must liberally construe his complaint. *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972). A liberal construction of Woodard's complaint leads the undersigned to conclude that Woodard set forth a claim of deliberate indifference to serious medical needs.

452 U.S. 337, 345-46 (1981); *Trop v. Dulles*, 356 U.S. 86, 101 (1958). The Eighth Amendment also prohibits conditions of confinement which, although not physically barbarous, "involve the unnecessary and wanton infliction of pain." *Rhodes*, 452 U.S. at 346. Among unnecessary and wanton inflictions of pain are those that are "totally without penological justification." *Id.*

To establish an Eighth Amendment claim, a plaintiff must satisfy both an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Wilson v. Seiter*, 501 U.S. 294, 297-300 (1991). "The objective component requires the pain inflicted to be 'sufficiently serious.'" *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011) (quoting *Wilson*, 501 U.S. at 298). "The subjective component focuses on the state of mind of the prison officials." *Williams v. Curtin*, 631 F.3d at 383.

While all Eighth Amendment claims involve an objective and a subjective component, the objective component is contextual and therefore varies depending on the claim asserted. *Hudson v. McMillian*, 503 U.S. 1, 8-9 (1992). The degree of harm necessary to satisfy the objective component depends on "contemporary standards of decency." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).

### a. Excessive Force

As set forth above, Woodard first avers that Sgt. Hoover utilized excessive force against him in violation of his Eighth Amendment rights. The essential inquiry for an Eighth Amendment claim of excessive force is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986). In

9

making this inquiry, courts are guided by "factors [such] as the need for application of force, the relationship between the need and the amount of force that was used [and] the extent of injury inflicted." *Id.* at 320-21.

The undersigned begins by acknowledging Woodard's allegations that the chemical agent caused burns across his body. (*Id.*, PageID.5-6.) These allegations are not controverted by Sgt. Hoover and are supported by affidavits from other prisoners who say that they personally observed the burns. (ECF No. 24-2, 24-3.) Furthermore, the allegations are consistent with Woodard's repeated exclamations that his skin was burning after Sgt. Hoover deployed the chemical agent. (*See, e.g.*, ECF No. 23, 08:51-08:54.)

But even Woodard seems to acknowledge that some use of force was necessary given the circumstances of the July 13, 2021 incident. (ECF No. 24, PageID.146 ("Just because some amount of force is justified, does not mean that an official may use whatever force they want.") The record before the Court reflects that Sgt. Hoover ordered Woodard to comply with a strip search after Sgt. Hoover found evidence that Woodard was illegally manufacturing alcohol in the prison. Woodard repeatedly refused to comply. Sgt. Hoover then gave Woodard a "cool-down" period of twenty or thirty minutes to reconsider his compliance, after which Woodard again refused to comply. Before deploying the chemical agent, Sgt. Hoover obtained permission to do so, and repeatedly informed Woodard that his failure to comply would result in the use of the chemical agent.

10

Woodard argues that Sgt. Hoover should have deployed the chemical agent "nearby" Woodard and not directly onto his skin. (ECF No. 24, PageID.148.) Alternatively, he contends that Sgt. Hoover should have simply left him in the shower cage and awaited his inevitable compliance with the strip search. (*Id.*, PageID.152-153.) The undersigned respectfully rejects these arguments.

As an initial matter, the undersigned notes that the video of the July 13, 2021 incident clearly depicts Woodard standing directly in front of the shower cage door when Sgt. Hoover approaches with the chemical agent. (*See* ECF No. 23, 00:51-01:02.) Woodard complains that the agent was sprayed directly onto his skin but fails to acknowledge that he had ample opportunity to step back from the door prior to Sgt. Hoover deploying the agent. Furthermore, Woodard's argument that "[i]n similar situations . . . [o]fficials will give the person some time to think about it and the inmates usually comply," (ECF No. 24, PageID.152-153), is undermined by his own conduct on July 13, 2021. Sgt. Hoover gave Woodard time to cool-off, and Woodard continued to refuse compliance.

But even setting Woodard's conduct aside, his arguments are unpersuasive. In *Caldwell v. Moore*, the defendant officers used a stun gun on the plaintiff after he repeatedly refused orders that he stop yelling and kicking his cell door.[3] 968 F.2d 595, 597 (6th Cir. 1992). The plaintiff averred that the use of the stun gun was

---

[3] It is worth noting that the incidents underlying this case occurred prior to the widespread usage of stun guns. Indeed, none of the defendant officers "had any formal training in the use of an electric stun gun, knew the capabilities of this particular electric stun gun, or received any express authorization to use an electric stun gun in the course of their employment." 968 F.2d at 597.

disproportionate to the need for order, and that the defendants should have garnered his compliance through less drastic means. *Id.* at 601. The Sixth Circuit rejected the plaintiff's arguments, pointing to the following observation by the Seventh Circuit in an analogous case:

> When an order is given to an inmate there are only so many choices available to the correctional officer. If it is an order that requires action by the institution, and the inmate cannot be persuaded to obey the order, some means must be used to compel compliance, such as a chemical agent or physical force. While experts who testified on behalf of the plaintiffs suggested that rather than seek to enforce orders, it was possible to leave the inmate alone if he chooses not to obey a particular order, and wait him out, experience and common sense establish that a prison cannot be operated in such a way.

*Id.* at 602 (quoting *Soto v. Dickey*, 744 F.2d 1260, 1267 (7th Cir.1984)).

To reiterate, Sgt. Hoover gave Woodard multiple opportunities to comply with the strip search. He also gave Woodard the opportunity to cool down and reevaluate his non-compliance. Sgt. Hoover deployed the chemical agent only after Woodard continued to refuse compliance. And he swiftly removed Woodard from the shower cage and thus the vicinity of the agent once Woodard complied with the search. In the undersigned's opinion, no reasonable finder of fact could determine that Sgt. Hoover's actions under the circumstances constituted a malicious and sadistic use of force as opposed to force applied in a good faith effort to restore discipline. *See Jennings v. Mitchell*, 93 F. App'x 723 (6th Cir. 2004) (affirming summary judgment in favor of a defendant corrections officer who deployed a chemical agent after the plaintiff ignored multiple orders to exit the shower); *Thomas v. Greene*, 201 F.3d 441 (6th Cir. 1999) (affirming the *sua sponte* dismissal of a prisoner's claim that a

corrections officer's use of a chemical agent following the prisoner's non-compliance with a strip search constituted excessive force). The undersigned therefore recommends that the Court grant Sgt. Hoover summary judgment as to Woodard's claim of excessive force.

### b. Deliberate Indifference

Woodard next avers that Sgt. Hoover was deliberately indifferent to his serious medical needs when he deployed the chemical agent and then allowed Woodard to sit in it for three days before his next shower.

Like all Eighth Amendment claims, a claim for the deprivation of adequate medical care has an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious. *Id.* In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. *Id.* The objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need[] for medical care is obvious even to a lay person." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 899 (6th Cir. 2004); *see also Phillips v. Roane Cnty.*, 534 F.3d 531, 539–40 (6th Cir. 2008).

The subjective component of a deliberate indifference claim requires an inmate to show that prison officials have "a sufficiently culpable state of mind" in denying medical care. *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000). Deliberate indifference "entails something more than mere negligence," but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with

13

knowledge that harm will result." *Farmer*, 511 U.S. at 835. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. To prove a defendant's subjective knowledge, "[a] plaintiff may rely on circumstantial evidence . . . : A jury is entitled to 'conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Rhinehart v. Scutt*, 894 F.3d 721, 738 (6th Cir. 2018) (quoting Farmer, 511 U.S. at 842)).

The subjective component was summarized in *Rhinehart v. Scutt*, 894 F.3d 721 (6th Cir. 2018). There, the court of appeals stated the following:

> [T]he plaintiff must show that each defendant acted with a mental state "equivalent to criminal recklessness." This showing requires proof that each defendant "subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk" by failing to take reasonable measures to abate it.
>
> A plaintiff may rely on circumstantial evidence to prove subjective recklessness: A jury is entitled to "conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." And if a risk is well-documented and circumstances suggest that the official has been exposed to information so that he must have known of the risk, the evidence is sufficient for a jury to find that the official had knowledge.
>
> But the plaintiff also must present enough evidence from which a jury could conclude that each defendant "so recklessly ignored the risk that he was deliberately indifferent to it."

*Id.* 738–39 (6th Cir. 2018) (internal citations omitted).

In the undersigned's opinion, Woodard fails to create a genuine issue of material fact as to the subjective component of his deliberate indifference claim.

Woodard complains that Sgt. Hoover "fail[ed] to decontaminate" him.[4] (ECF No. 1, PageID.8.) Woodard complains that he was not permitted to shower for approximately three days. But the videorecording of the July 13, 2021 incident, together with the sworn statements on the record, establishes that Woodard stood under a shower immediately after Sgt. Hoover deployed the chemical agent. (ECF No. 22-2, PageID.87; ECF No. 23, 01:03.) After Woodard complied with the strip search, Hoover immediately had Woodard moved away from the area in which the chemical agent was deployed. (ECF No. 23, 02:52-05:00.) While he was in the yard, a nurse attempted to conduct an exam, and Woodard shooed her away. (*Id.* at 08:31-08:38.) And before Sgt. Hoover took Woodard back to his cell, Sgt. Hoover advised Woodard to wash off once he got there, specifically mentioning that Woodard should use a washcloth around his eyes.[5] (*Id.* at 14:24-14:33.) Simply put, it is the undersigned's opinion that these are not the actions of an individual who is deliberately indifferent to the harm chemical agents can cause.

---

[4] In his response to Sgt. Hoover's motion for summary judgment, Woodard further contends that he was designated "high risk for respiratory issues if sprayed with chemical agent." (ECF No. 24-1, PageID.163.) This allegation is notably absent from Woodard's complaint, which focused on the after-effects of the agent. Nevertheless, the undersigned notes that Sgt. Hoover specifically ordered the ERT to let Woodard stay outside and "get some oxygen" before returning to his cell based on his high-risk status. (ECF No. 23, 08:45-08:50.) It was only after Woodard complained about the sun that the ERT brought him back into the shade of the facility. (*Id.* at 08:51-09:16.) Even then, the ERT left the door open to allow Woodard access to fresh air. (*Id.* at 09:16-14:36.)

[5] Notably, despite Woodard's complaints that he was not permitted to shower for three days, Woodard alleged in his verified complaint that he tried to wash off the chemical agent when he returned to his cell, but "water intensified the burn." (ECF No. 1, PageID.4-5.)

Ultimately, the undersigned is sympathetic to the invasive nature of a strip search. And the undersigned is sympathetic to any burns that Woodard received from the chemical agent. But Woodard's account together with the videorecording of the July 13, 2021 incident establish that Sgt. Hoover deployed the chemical agent in a good faith effort to restore discipline after Woodard repeatedly refused to adhere to a direct order. Furthermore, there is no evidence that Sgt. Hoover acted with a state of mind akin to criminal recklessness when he placed Woodard back into a cell with running water and towels without decontaminating him first. Accordingly, the undersigned respectfully recommends that the Court grant Sgt. Hoover's motion for summary judgment.

## VI.    Qualified and Sovereign Immunity

In addition to arguing that he did not violate Woodard's rights under the Eighth Amendment, Sgt. Hoover asserts that he is entitled to qualified immunity in his individual capacity and sovereign immunity in his official capacity. (ECF No. 22, PageID.80-81.)

Sgt. Hoover's claim for qualified immunity is largely redundant. After initially arguing that he is entitled to judgment because he did not violate Woodard's Eighth Amendment rights, he argues that he is entitled to qualified immunity because he did not violate Woodard's Eighth Amendment rights.[6] In any event, the undersigned agrees; because there are no genuine issues of material fact and the undersigned finds

---

[6]    In other words, Sgt. Hoover does not argue that the rights at issue were not clearly established.

that Sgt. Hoover did not violate Woodard's Eighth Amendment rights, Sgt. Hoover is entitled to qualified immunity in his individual capacity. *See Phillips v. Roane Cty.*, 534 F.3d 531, 538 (6th Cir. 2008) ("Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982))).

Sgt. Hoover's claim for sovereign immunity is different. Hoover argues that he is entitled to sovereign immunity in his official capacity as to Woodard's claims for monetary damages regardless of the merits of Woodard's claims.

A lawsuit against a state official for monetary damages is treated as a lawsuit against the State. *Brandon v. Holt*, 469 U.S. 464, 471 (1985). The states and their departments are immune under the Eleventh Amendment from suit in the federal courts unless the state has waived immunity or Congress has expressly abrogated Eleventh Amendment immunity by statute. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98–101 (1984); *Alabama v. Pugh*, 438 U.S. 781, 782 (1978); *O'Hara v. Wigginton*, 24 F.3d 823, 826 (6th Cir. 1993). Section 1983 did not expressly abrogate Eleventh Amendment immunity, *Quern v. Jordan*, 440 U.S. 332, 341 (1979), and the State of Michigan has not consented to civil rights suits in federal court, *Abick v. Michigan*, 803 F.2d 874, 877 (6th Cir. 1986). As such, Woodard's claims against Sgt. Hoover in his official capacity for monetary damages are properly dismissed in accordance with Eleventh Amendment.

## VII. Recommendation

The undersigned respectfully recommends that the Court grant Sgt. Hoover's motion for summary judgment. In the opinion of the undersigned, there are no genuine issues of material fact; despite Woodard's contentions, no reasonable finder of fact presented with the video-footage could find that Sgt. Hoover used force maliciously or sadistically to cause Woodard harm. Nor could a reasonable finder of fact determine that Woodard acted with deliberate indifference to Woodard's serious medical needs related to the chemical agent.

If the Court accepts this recommendation, this case will be dismissed.

Dated:   June 21, 2023                                    /s/ *Maarten Vermaat*
                                                          MAARTEN VERMAAT
                                                          U. S. MAGISTRATE JUDGE

## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C) Fed. R. Civ. P. 72(b). All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).